A. J. HARLAN, JR., Defendant in Error, *vs.* A. J. HAR-
LAN, SR., *et al.* Plaintiffs in Error.

*Opinion filed April 20, 1916.*

1. INJUNCTION—*when a court of equity will enjoin interference
with possession.* Where a father agrees that a son shall have a par-
ticular tract of land if he will do certain things, and the evidence
clearly shows that the son has entered into possession of the land
and has performed his part of the agreement for many years, a
court of equity will enjoin the father from interfering with the
son's possession so long as he performs in good faith, or is ready
and willing to perform, the obligations assumed under the contract.

2. SPECIFIC PERFORMANCE—*an oral promise to convey land may
be enforced in equity.* An oral promise to convey land will be en-
forced in equity, notwithstanding the Statute of Frauds, where the
evidence shows clearly the existence and terms of the agreement
and that the promisee has taken possession of the land, made lasting
and valuable improvements thereon, paid the taxes and made other
expenditures and has performed his agreement in all particulars.

WRIT OF ERROR to the Circuit Court of Fulton county;
the Hon. ROBERT J. GRIER, Judge, presiding.

C. D. HENDRYX, for plaintiffs in error.

CHIPERFIELD & CHIPERFIELD, (M. T. ROBISON, of
counsel,) for defendant in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a bill filed by defendant in error in the circuit
court of Fulton county for an injunction against plaintiffs
in error to restrain them from interfering with his posses-
sion of certain real estate. He also asked for the specific
performance of an oral contract to convey the legal title to
this property and for an accounting, and that plaintiffs in
error be restrained from prosecuting certain litigation. An
answer was filed to this bill, alleging, among other things,
that the Statute of Frauds prevented the court from allow-
ing the relief prayed for. A cross-bill was also filed and

answer thereto. The matter was then referred to a master in chancery to take evidence, who reported in favor of defendant in error. On the cause coming on for hearing the chancellor approved the findings of the master and perpetually enjoined the plaintiffs in error from interfering with defendant in error's possession of the real estate described, so long as he performed, or in good faith showed a willingness to perform, the obligations assumed by him in said oral contract, and also enjoined A. J. Harlan, Sr., from prosecuting a certain suit instituted by him against defendant in error for the possession of said property, and from commencing, prosecuting or maintaining any action at law or in equity for the possession of said premises. The chancellor also decreed that the cross-bill filed by plaintiffs in error be dismissed at their costs. This writ of error was sued out from that decree.

A. J. Harlan, Sr., at the time of the trial was about seventy-eight years of age. For many years he had owned a farm of some 412 acres, situated partly in Fulton and partly in Knox county. About 1890 Harlan, Sr., with Samuel Hale, engaged in the brick business in London Mills, Fulton county. This business proved unsuccessful. In order to provide for an indebtedness growing out of that venture he mortgaged his farm property to secure about $14,500. His family consisted of his wife and three sons, Oscar, Custer and defendant in error, A. J. Harlan, Jr., who was frequently called Jay and will be so designated in this opinion. The family resided on the farm during the time he was engaged in the brick business. For several years previous to 1901 the work on the farm was in charge of the sons. Oscar first had charge of it, the other boys working with him, and later Oscar moved to another farm and Custer had charge of the work. Oscar and Custer both married some time previous to 1901, and Jay, the youngest, was that year twenty years of age and unmarried. The testimony shows, without contradiction, that in September of

that year, at the suggestion of Harlan, Sr., his wife apparently joining therein, he had a talk with all three of the boys at the barn on the home place as to dividing all his land among the three boys. The chief question in dispute is as to whether the agreement entered into on that day was a temporary or permanent arrangement. The three Harlan boys all testified on this trial that the father proposed to them that if they would assume the mortgage then on the place of about $14,000 principal, pay the interest on the same, pay taxes, keep up the improvements and repairs and provide for their parents as long as they lived, all of said farm land should be the property of the three boys; that the three sons agreed to this proposal made by the father and sanctioned by the mother, and that under said agreement Oscar took possession of one eighty, Custer of another eighty, and defendant in error, Jay Harlan, took possession of the home eighty, upon which the buildings of the farm were situated, it being understood and agreed by all the parties at that time that the remainder of the farm land should be held and used in common by the three sons. It was further understood and agreed at that time that the parents were to reside on the home eighty and keep house for Jay, and that he was to provide for them, and that because of Jay agreeing to support the old people, the personal property on the farm was to be given to him, amounting to about $2800. Harlan, Sr., testified on this trial that the agreement was not between the three boys and himself but between himself and the two older boys; that he did not intend to divest himself of the ownership of the place at that time but wanted to divide the place so that each one would have a share to work for himself, and that nothing was said about their supporting himself or his wife. We think the great weight of the testimony in the record shows that the boys went into immediate possession of the property in September, 1901; that Jay took charge of the home place and that the personal property on that place was all

turned over to him; that the father and mother lived with him and kept house for him; that he paid practically all of the bills, including those for food and clothing for the family.

In the fall of 1902 it was agreed between the father, mother and Jay that Jay should take his mother to Denver, Colorado. According to the testimony of defendant in error this visit to Denver was made principally for the mother's health, though he was to go to school while he was there. He further testified that he wished his father to take the mother to Colorado, but his father wanted defendant in error to do so. Harlan, Sr., testified that the primary purpose of the trip was that the son might go to school, although, the mother's health not being good, it was thought she might be improved by the change of climate. Just before going to Colorado there was a sale of the personal property on the farm, the proceeds being $2800. With this amount the defendant in error paid off some of the debts incident to the running of the farm and some debts incurred by the father and others, dating back to when his brothers, Oscar and Custer, ran the place. Defendant in error testified that he then had a little over $900 left out of the sale money, from which he paid the expenses of the trip to Denver and sent back some $300 or $400 to his father. The father, while agreeing that the son took the proceeds of the sale, denies that he paid any of the said debts, and also claims that from the money the son sent back he re-stocked the farm. Defendant in error stayed in Colorado with his mother until the summer of 1903, when he came back and helped in the haying and harvesting. While the testimony is not very clear on this point, it seems that the older sons helped farm the home eighty while defendant in error was absent in Colorado. He came back in the summer to assist in the farm work, the mother not returning until several months later. The father also insists that Jay, when he went to Colorado, talked of study-

ing law and leaving the farm. The son concedes that there was talk of his studying law but does not admit that there was any talk as to his giving up the control of the farm.

After defendant in error's return he took charge of the farm work of the home eighty the same as he did before he went to Colorado. A woman was employed to keep house for them until the mother returned and took charge the same as she had before she went west with the son. The mother died in 1904, after which various persons kept house for the father and son, being paid by the latter. Jay married in 1908 and brought his wife to the old home to live. Harlan, Sr., lived with them and ate at the same table for several years. In 1910 or 1911 troubles arose, apparently commencing between the father and Jay's wife, and the father very shortly after began to occupy one-half of the house and defendant in error the other half. For a little time the father had a housekeeper. After that, for a period of time, his meals were taken to him by defendant in error or his wife. The disagreements between them became more frequent, and the father finally, some time before these proceedings began, started to taking meals with a brother who lived about a quarter of a mile from the home place, and was taking his meals there with the brother at the time of this trial. The testimony is voluminous as to the cause and nature of the disagreements. Some of them arose over the clothing of the old gentleman and many of them over meals; some of them over the use of the bedding in the house, and some over the care and conduct of the farm. The father, while these disagreements were going on, insisted that the son should give up the farm,—that he had no right to stay there contrary to the wishes of the father. There was also a disagreement as to taking up and repairing fences. Many of the disagreements grew out of the fact that the father insisted that he had the entire right to the home place and that the son had no interest there after the father had decided to take charge. At

about the same time a dispute arose between the father and
the other two sons as to their right to the rest of the land,
and court proceedings were instituted by the father to get
possession of all the farms. On March 10, 1911, the father
served a demand for possession of all the premises upon
each of his three sons, which stated that they were notified
"that in consequence of your default in not paying, as per
agreement, the principal of the $14,000 mortgage, or any
part of it, that is on my farm of the premises now occupied
by you, [describing the land,] I have elected to determine
your agreement or lease, and you are hereby notified to
quit and deliver up possession to me within thirty days of
this date." The testimony shows that up to this time the
sons had paid the taxes on all the land and had kept up the
interest on the mortgage but had not paid off any of the
principal. It is not claimed by anyone that there was any
specific agreement as to when the principal of the mort-
gage, or any part of it, should be paid. Defendant in error
testified that he was ready to pay $1000 in 1910, but that
his father said to wait awhile. Not long after the forcible
entry and detainer suit was started by the father under this
notice, Custer Harlan filed proceedings in the county court
to have the father declared a distracted person and inca-
pable of caring for his property, stating that his personal
property was worth about $100 and the rents derived from
his real estate were about $1500. As a result of all this
litigation, the father, Oscar and Custer came to an agree-
ment to settle their troubles, which was put in writing,
whereby the father agreed that he would deed to each one
of them the eighty acres upon which he resided, they giv-
ing up all their interest in the rest of the farm, which had
been held and used jointly by the three sons since the agree-
ment of 1901. At the same time there was an agreement
between the father and the two older sons as to what part
of the $14,000 mortgage each should assume. Defendant
in error does not seem to have been a party to this settle-

ment, although all the proceedings between the father and sons at that time were dropped. Within a few days after this settlement was effected defendant in error filed a petition in the county court to have the father adjudged a distracted person and incapable of caring for and managing his estate, stating that his personal property was worth about $100 and that the rents derived from the real estate were about $1000. On a trial of this cause the verdict resulted in favor of the father. At or about that time the father had leased a part of the land here in dispute between defendant in error and himself to Lewis Heikes and Charles Cozard, and new forcible entry and detainer proceedings were started against defendant in error January 20, 1914. These proceedings were thereafter instituted by defendant in error in April, 1914.

Two witnesses testified in this case that they served as jurors in one of the several forcible entry and detainer suits that the father started against the boys after his troubles began with them in 1910, and that the father testified in that suit that he had made an agreement with Jay, Oscar and Custer that they were to have possession of the land by assuming the mortgage, paying taxes and making improvements and keeping up the farm lands, and that he had commenced that forcible entry and detainer suit because they had not paid off the mortgage. Other persons present at the forcible entry and detainer trial testified to the same effect. A witness also testified that the father stated on that trial on the witness stand that he had plenty to eat and wear during the time since he had made the agreement. The testimony of several witnesses was to the effect that they were proprietors of stores, and that the father ran an account with them at various times when he was living with Jay and that Jay always paid the bills.

From time to time defendant in error, while he occupied the home eighty, had made certain improvements thereon. He painted the house and put two porches on it, built a cat-

tle shed that cost several hundred dollars, built a hog shed, cleared off several acres of timber, bought lumber to be used on the place, costing $500, and sawed up some lumber which was used on the place, and, according to his testimony, in every way conducted the business on the farm, up to 1911, as if he were the owner of the farm, in accordance with his and his brothers' testimony as to the agreement in 1901. The mortgage on the place was renewed in 1902, while defendant in error was absent in Colorado, the two older sons and the father signing the new mortgage. Defendant in error testified that he expended in the care of the farm and improvements made thereon, and in expenses for his father and mother during the time he had control of the home eighty, both before and after he went to Colorado and while he was there, during all of these years, between $12,000 and $13,000.

We think the great weight of the testimony is to the effect that up to the time these disagreements arose between the father and the son and the son's wife the son took care of the father and mother in accordance with the agreement made in September, 1901, as testified to by the sons. The testimony also shows, we think, that the defendant in error furnished good food and a reasonable amount of it, or was willing to furnish it, to the father, and that he furnished him with the necessary clothing. After the disagreements arose between them, the testimony of the father and the son is in direct conflict as to what each of them did. We think the evidence tends strongly to show that the father, during some of these disagreements, acted most unreasonably; that after he began to live in another part of the house he took, at one time, much if not all of the bed clothing to his part of the premises and would not allow the son to get any of it for use. The testimony shows that the son broke down the door and that the father attempted to attack him with a stick of wood, when the son took hold of him and held him, and finally told his wife to go over

and tell an uncle on the adjoining farm; that when the
uncle came they adjusted the difficulty temporarily, the
uncle testifying that he thought there was no need of the
son holding the father,—that he would be peaceable if he
was let alone.

As usual in cases of this kind, the testimony is in sharp
conflict on many points. We think, however, that the pre-
ponderance of the evidence tends strongly to support the
conclusion reached by the master and the chancellor that
the father had made a definite, oral agreement with the
sons in September, 1901, to divide the land among them
and that they were to provide for the support of himself
and his wife during their natural life; that it was under-
stood among the sons that Jay was to have the personal
property on the place because he was to live with the father
and mother and take care of them for some years. A
promise or agreement by a father to a child to convey a
tract of land if the child will take possession of and im-
prove the same, when followed by possession and the expen-
diture of labor and money in making lasting and valuable
improvements, may be regarded as resting upon a valuable
consideration and will be upheld and enforced in a court of
equity. (*McDowell* v. *Lucas,* 97 Ill. 489; *Langston* v.
*Bates,* 84 id. 524; *Wood* v. *Thornly,* 58 id. 464; *Kurtz* v.
*Hibner,* 55 id. 514.) When a contract is proved and is
founded upon a good and valuable consideration and has
been performed by one party, a court of equity will decree
its specific performance at the suit of such party. The
complainant must show that he has done, or is ready and
willing to do, all things that are required of him by the
agreement according to its terms, and if he does that he
is entitled to have the other party perform his part of it.
(*Clancy* v. *Flusky,* 187 Ill. 605.) An oral promise to con-
vey land will be enforced in equity, notwithstanding the
Statute of Frauds, where the evidence shows clearly the ex-
istence and terms of the agreement, and that the promisee

took possession of the land, made valuable and lasting improvements thereon, paid the taxes and made other expenditures, and performed his agreements in all particulars. (*White* v. *White,* 231 Ill. 298; *Bohanan* v. *Bohanan,* 96 id. 591; *Irwin* v. *Dyke,* 114 id. 302; *Fouts* v. *Roof,* 171 id. 568.) Clearer proof is required where the alleged contract is between father and son. (*Richardson* v. *Lander,* 267 Ill. 181; *Ranson* v. *Ranson,* 233 id. 369.) The testimony is not definite as· to how long defendant in error, alone, was to take care of his father and mother, but we think it conclusively appears that he took care of his mother up to the time of her death and that he took care of his father until the disputes arose after the son was married, in 1908. There is no definite evidence as to when, if at all, the father was to give a deed to the son. Defendant in error testified the father was not to make a deed. We think it is a fair conclusion from the record that he was not to give a deed during his lifetime, but the land was to go to the son when the father and mother had both died.

The evidence in the record justifies the finding in the decree restraining the father from interfering with the possession of the property here in question so long as the son performs in good faith, or shows a willingness to perform, the obligations assumed by him in the oral agreement, and that all the plaintiffs in error should be restrained from prosecuting suits of forcible entry and detainer against defendant in error as to the property here in question. The testimony in this record is sufficiently clear, definite and certain to support the decree herein.

The decree of the circuit court will be affirmed.

*Decree affirmed.*

Mr. JUSTICE CRAIG took no part in the decision of this case.